# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**OMAR CAMACHO LARTIGAUT**
    **Plaintiff,**

  v.                                          **Case No. 06-C-143**

**JO ANNE B. BARNHART**
**Commissioner of the Social Security Administration,**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Omar Camacho Lartigaut seeks judicial review of the denial of his application for social security disability benefits. See 42 U.S.C. § 405(g). Plaintiff alleged that he was unable to work due to a neck injury, but his claim was denied initially and on reconsideration, and by an Administrative Law Judge ("ALJ") after a hearing. The Appeals Council then denied his request for review, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). See Prochaska v. Barnhart, 454 F.3d 731, 734 (7th Cir. 2006).

## I. STANDARD OF JUDICIAL REVIEW

Under § 405(g), the district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the scope of the court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).

Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. Id. The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991).

## II. DISABILITY STANDARD

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently working; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling; (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work; and (5) if not, whether the claimant is able to perform any other work in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled. A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. The claimant carries the burden at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that he is capable of performing other work in the national economy. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who

2

evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid to deny a claim if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work. In such a case, the ALJ must solicit the testimony of a VE. <u>Masch v. Barnhart</u>, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

### III.  FACTS AND BACKGROUND

**A.     Plaintiff's Application and Administrative Decisions**

Plaintiff applied for benefits on July 8, 2003, alleging inability to work since May 19, 2003 due to neck pain and arthritis in his shoulder. (Tr. at 86, 91, 255.) Plaintiff's claim was denied initially on August 14, 2003 (Tr. at 55, 64, 258) and on reconsideration on November 19, 2003 (Tr. at 54, 60, 259-60). Plaintiff requested a hearing (Tr. at 59) and on August 12, 2005, he appeared with counsel before ALJ Mary Ann Lunderman (Tr. at 20).

**B.     The Hearing**

Plaintiff testified that he was twenty-six years old, 6'1" tall and weighed 300 pounds. (Tr. at 24.) He indicated that he had a high school education with additional vocational training in printing. (Tr. at 25.) Plaintiff testified that he last worked in 2003 for a printing company and that his previous work was mainly in printing. (Tr. at 27-28.) He stated that he was no longer able to work due to pain in his neck. (Tr. at 26-27.) However, he testified that he was not taking any medication or seeing a doctor for the pain. (Tr. at 27.)

3

When asked to describe his physical abilities, plaintiff stated that he had no difficulty sitting or standing and could walk two to three blocks. However, he stated that he was unable to lift and carry. (Tr. at 28.) He also said that he had trouble raising and lowering his head, and that he could maintain head position for maybe twenty to thirty minutes. (Tr. at 32.)

Plaintiff testified that on a normal day he slept late, took a shower, visited his father or friends, then rested and watched television the rest of the day. (Tr. at 28, 33-34.) He stated that he did a little housework, had no hobbies, and infrequently drove because he had trouble turning his head. (Tr. at 29, 31.) Plaintiff testified that he was able to cook and shop for himself, but had trouble carrying the bags. (Tr. at 33.) He stated that he was currently enrolled at the MATC vocational rehabilitation college taking classes in communications two hours per day. (Tr. at 31.)[1]

**C.     Medical Evidence**

   **1.     Treating Physicians**

In April 2003, plaintiff sought treatment for neck pain and stiffness. He mentioned having been in a motor vehicle accident five years previously but stated that the pain had recently developed while bending his head over a table at work. (Tr. at 142-45, 148, 164, 170.) He denied any numbness and tingling in the arms but on examination had limited range of motion. Dr. Nancy Petro provided Flexeril, a muscle relaxant, and Naprosyn, an anti-inflammatory, fitted plaintiff with a cervical collar, and referred him for physical therapy. (Tr. at 170.) Plaintiff noted improvement with this course of treatment and continued to work

---

[1] The ALJ obtained the appearance of a VE (Tr. at 23; see also Tr. at 69) but asked him no questions.

on light duty. (Tr. at 167-69.) However, once he returned to regular duty work the symptoms worsened. (Tr. at 165.) Dr. Petro obtained an x-ray of the cervical spine, which was normal. (Tr. at 165.) However, a subsequent CT scan revealed subluxation[2] of C2 relative to C1, with ligamentous injury and severe canal narrowing at C1-C2. (Tr. at 149, 150, 175.) Dr. Petro allowed plaintiff to continue working but restricted him from repetitive neck flexion and referred him for a neuro-surgical consult. (Tr. at 164.)

After several additional referrals, and continued complaints of pain and limited range of motion (Tr. at 195, 197-99), plaintiff saw Dr. Alexander Hawkins in July 2003. Plaintiff stated that he had experienced some pain relief with conservative treatment but still found the pain and loss of motion intolerable. Due to the severe subluxation of the C-spine, Dr. Hawkins recommended surgery, and plaintiff agreed to a posterior cervical fusion. (Tr. at 214-18.) Dr. Hawkins performed the procedure on September 11, 2003. (Tr. at 210-12.) Plaintiff returned to Dr. Hawkins on October 6 and was doing well with no pain. Dr. Hawkins continued plaintiff in the halo that had been installed during the surgery. (Tr. at 209.) On October 16, plaintiff noted some pain and spasm, which resolved with medication. Dr. Hawkins stated that plaintiff was doing well, with a normal neurological exam. (Tr. at 208.)

On December 8, 2003, plaintiff returned to Dr. Hawkins and reported no new symptoms or changes, neurologic deficits, or significant neck pain or spasm. He was taking no pain medications. Plaintiff's neurologic exam was normal, and Dr. Hawkins removed the halo and replaced it with a C-collar. (Tr. at 247.) On January 5, 2004, Dr. Hawkins observed plaintiff to have limited range of motion ("ROM"), as expected, but plaintiff denied

---

[2]Subluxation is an incomplete dislocation. Stedman's Medical Dictionary 1856 (28th ed. 2006).

any new symptoms or problems and was not taking any pain medications. (Tr. at 246.) On exam, plaintiff's ROM was 10 degrees rotation to the left and right, and 60 degrees flexion and 20 degrees extension. X-rays showed the fusion to be in good alignment. (Tr. at 246, 252.) Plaintiff returned for his final visit on February 2, 2004, and was doing very well with no significant neck pain or problems, and taking no medications. On exam, his ROM was 60 degrees flexion, 20 degrees extension and 10 degrees rotation bilaterally. X-rays continued to show good alignment. (Tr. at 245, 251.) Dr. Hawkins's impression was that plaintiff was neurologically doing well without neck pain, and he was discharged with instructions to return on an as needed basis. (Tr. at 245.)

On April 7, 2004, plaintiff was evaluated by Dr. Vance Masci in connection with a workers' compensation claim he had filed against his employer. On examination, plaintiff had a stiff cervical spine with a ROM of 0 degrees extension, mildly decreased in flexion, and markedly decreased in rotation and lateral flexion. Dr. Masci stated that the surgery led to marked improvement in plaintiff's condition, but that his recovery was incomplete. (Tr. at 241.) Plaintiff returned to Dr. Masci on April 28, continuing to complain of pain and stiffness, but reported taking no medications. He stated that his symptoms increased with activity, especially head rotation. Plaintiff also complained of left wrist pain, following a previous surgery.[3] (Tr. at 243-44.) On April 28, 2004, Dr. Masci completed a report for plaintiff's workers' compensation claim, indicating that it was unlikely plaintiff could return to full time work. He limited plaintiff to lifting 10 pounds maximum, working two to three hours per day,

---

[3] According to previous records, plaintiff had two wrist surgeries, one where a screw was placed for non-union, and the second for screw removal in 2001. (Tr. at 192.)

6

and no head rotation, flexion or extension.  He assigned 15% permanent partial disability ("ppd").  (Tr. at 239-40.)

On May 4, 2004, Ronald Nemiroff, MS, CRC, completed a vocational evaluation related to plaintiff's workers' compensation claim, in which he opined, based on Dr. Masci's report and plaintiff's lack of transferrable work skills, that plaintiff had sustained a 100% loss of earning capacity.  (Tr. at 118-21.)

On November 23, 2004, Dr. Stephen Robbins completed an independent medical evaluation for plaintiff's employer in connection with the workers' compensation claim.  Plaintiff complained of stiffness in his neck and a tired sensation, but denied any weakness in the arms.  On examination, he could forward flex 30 degrees, had 30 degrees of rotation, and 10 degrees of lateral bending.  After discussing causation issues relevant to the workers' compensation dispute, Dr. Robbins opined that plaintiff had reached a healing plateau as of September 1, 2004, sustaining 10% ppd.[4]  (Tr. at 248-50.)

### 2. SSA Consultants

On July 31, 2003, Dr. Pat Chan completed a physical RFC assessment for the SSA, in which he opined that plaintiff was capable of light work,[5] with no postural or other non-exertional limitations.  (Tr. at 176-83.)  On November 17, 2003, Dr. John McDermott

---

[4]Plaintiff's employer eventually settled the workers' compensation claim for $50,000. (Tr. at 127-31.)

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).

7

completed a physical RFC assessment for the SSA, opining that plaintiff was capable of medium work,[6] with no postural or other non-exertional limitations. (Tr. at 229-36.)

**D.    ALJ's Decision**

On October 13, 2005, the ALJ issued an unfavorable decision. The ALJ found that plaintiff was unemployed, and that he suffered from severe impairments – C1-2 subluxation, status post fusion, and degenerative disc disease of the cervical spine – none of which met a Listing. (Tr. at 15, 19A.) Based on these impairments, the ALJ found that plaintiff retained the RFC to perform a full range of light work, with some pushing and pulling, and occasional climbing, balancing, stooping, kneeling, crouching and crawling. To the extent that plaintiff alleged greater restrictions, the ALJ found his testimony not fully credible. (Tr. at 16.) Specifically, the ALJ noted that plaintiff recovered well from the cervical fusion, underwent limited treatment thereafter, and engaged in fairly normal daily activities. The ALJ also stated that this RFC was consistent with the SSA consultants' reports. The ALJ rejected Dr. Masci's report based on the limited treatment he offered plaintiff and the report's inconsistency with the record as a whole. (Tr. at 17-18.) Based on this RFC, the ALJ found that plaintiff could not return to his previous work, which she rated as medium to heavy. (Tr. at 18.) However, relying on Grid Rule 202.20, the ALJ concluded that plaintiff was not disabled at step five and therefore denied the claim. (Tr. at 19-20.)

Plaintiff sought review by the Appeals Council, but on December 2, 2005, the Council denied his request. (Tr. at 5.)

---

[6]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

8

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred in relying on the Grid to reject his claim.  As noted, at step five of the sequential evaluation process the ALJ may either consult the Grid or obtain testimony from a VE.  In the present case, although the ALJ summoned a VE to the hearing, she took no testimony from him.

The Grid is designed for cases in which the claimant is restricted entirely or mostly from exertional or strength limitations (i.e., in sitting, standing, walking, lifting, carrying, pushing and pulling).  Haynes v. Barnhart, 416 F.3d 621, 628 (7th Cir. 2005).  The Grid does not apply where non-exertional (e.g., postural, manipulative, visual, communicative or environmental) limitations substantially affect the claimant's ability to work.  Id.  In such cases, the ALJ must consult a VE.  Id. at 629; Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994) ("This court has said that in cases where a non-exertional limitation might substantially reduce a range of work an individual can perform, the ALJ must consult a vocational expert.").

In the present case, the ALJ found that plaintiff retained the RFC to perform a full range of light work (Tr. at 18), making use of the Grid appropriate.  Plaintiff contends that the ALJ failed to consider the testimony and medical evidence pertaining to his neck pain and limited range of motion.  Such limitations may disallow use of the Grid, but only if they substantially limit the claimant's ability to work.[7]  E.g., Caruso v. Comm'r of Soc. Sec., 99 Fed. Appx. 376, 381-82 (3d Cir. 2004) (finding that inability to rotate or flex neck was non-

---

[7]Pain can be considered exertional or non-exertional or both, depending on how it affects the person's ability to work.  See SSR 96-8p.  For instance, it may be considered exertional if it affects the person's ability to lift or walk, but non-exertional if it affects his ability to concentrate or bend.

9

exertional limitation that could make Grid inapplicable, but affirming the ALJ's decision where such limitation was not significant); Naji v. Barnhart, No. 03-01791, 2004 U.S. Dist. LEXIS 25196, at *30-34 (N.D. Cal. Dec. 9, 2004) (affirming ALJ's decision where alleged non-exertional limit on bending and rotating the neck was not substantial); Johnson v. Barnhart, No. 02-037-B, 2003 U.S. Dist. LEXIS 870, at *21-22 (D.N.H. Jan. 21, 2003) (finding use of Grid improper where ALJ ignored evidence of postural limitations, including on neck flexion); see also Canfield v. Apfel, No. 00-267-B, 2001 U.S. Dist. LEXIS 6381, at *19-20 (D.N.H. Apr. 19, 2001) (reversing step four determination where ALJ failed to consider medical evidence of claimant's limitation on turning her head and neck).

The Commissioner defends the ALJ's decision on the ground that substantial evidence supported her finding of no significant, non-exertional limitations. Therefore, I must determine whether the ALJ properly excluded such limitations from plaintiff's RFC. If so, reliance on the Grid to deny the claim was proper. If not, the matter must be remanded.

Upon review of the entire record, I conclude that the ALJ properly considered the testimony and medical evidence in setting RFC. Thus, she did not err in relying on the Grid.

**A.    Consideration of Testimony**

Plaintiff testified that he suffers significant neck pain, which requires him to rest for much of the day; that he cannot turn his head more than 10 degrees; and that he can hold his head in position for only about twenty to thirty minutes. However, the ALJ found his testimony not fully credible in light of the entire record. (Tr. at 16.) Specifically, she noted that plaintiff recovered well from his surgery and, by the time he was discharged by Dr. Hawkins, was essentially symptom-free, aside from some limitation in motion. Further,

10

although plaintiff complained of pain at the hearing, he admittedly took no medication and received no treatment therefor. (Tr. at 17.) Finally, the ALJ noted that plaintiff enjoyed fairly normal daily activities, such as cooking, shopping, performing household chores, driving and attending classes two hours per day. He reported no limitations on his ability to sit or stand.[8] (Tr. at 18.)

Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing. Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). However, the ALJ must comply with SSR 96-7p in evaluating credibility. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). SSR 96-7p establishes a two step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. The ALJ must first consider whether the claimant has an impairment that could reasonably be expected to produce his pain or other symptoms. If not, the symptoms cannot be found to affect his ability to work. SSR 96-7p. If so, the ALJ must determine the extent to which the symptoms limit the claimant's ability to work. SSR 96-7p. At the second step, the "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55

---

[8]At one point during the hearing, plaintiff testified that his weight affected his ability to stand "a little bit." (Tr. at 28.) However, he went on to say that he was "okay." (Tr. at 28.) Plaintiff does not contend that he has any specific restrictions due to his weight, or that the ALJ failed to consider the issue of obesity. As far as I can tell, no doctor labeled plaintiff obese or suggested limitations due to his weight. It appears that plaintiff gained a considerable amount between the time of his surgery in 2003, when he was listed at 235 pounds (Tr. at 216), and the hearing, when he said he weighed 300 pounds (Tr. at 24). I need not discuss the issue further.

11

F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. SSR 96-7p.

I cannot conclude that the ALJ erred in finding plaintiff's complaints of greater restrictions not fully credible. The ALJ acknowledged the requirement that she consider plaintiff's subjective complaints under SSR 96-7p and conceded that he had a severe impairment which could cause pain and other symptoms. (Tr. at 16.) Accordingly, she limited him to light work, with only occasional climbing, balancing, stooping, kneeling, crouching and crawling, stating that this RFC "allows for many of his subjective complaints and limitations." (Tr. at 16.) The ALJ offered legitimate reasons for rejecting any further restrictions. She cited the medical evidence that plaintiff's condition initially responded well to conservative treatment (Tr. at 16) and that the cervical fusion surgery was successful in alleviating most of his symptoms (Tr. at 17). By the time he was discharged by Dr. Hawkins, plaintiff was functioning well aside from some limited ROM. (Tr. at 17.) The ALJ also noted that plaintiff underwent no treatment for his pain and took no medication.[9] (Tr. at 17.) Finally, she noted that plaintiff engaged in various daily activities. (Tr. at 18.) Given her thorough review of the record under the proper legal standards, I cannot conclude that the

---

[9]Plaintiff complains that the ALJ did not ask why he was not taking pain medication. However, there is no suggestion in the record that plaintiff was unable to obtain medication or treatment, such that the ALJ should have inquired further. As the ALJ noted, Dr. Hawkins's records reflect that plaintiff was not taking medication because he did not need it. (Tr. at 17.)

12

ALJ's credibility determination was patently wrong. See, e.g., Schmidt v. Barnhart, 395 F.3d 737, 747 (7th Cir. 2005) (affirming where the ALJ noted the absence of objective medical evidence supporting pain complaints, that the claimant's daily activities were not significantly restricted, that he was not receiving any active treatment or therapy for his conditions at the time of the hearing, and that he was not using any prescription medication).[10]

## B. Consideration of Medical Evidence

Plaintiff also points to the medical evidence of his pain and limited range of motion. He notes that on January 5, 2004, Dr. Hawkins found him to have a somewhat limited ROM, which was unchanged on February 5, 2004.[11] However, when he saw Dr. Masci on April 7, 2004, his ROM was 0 degrees in extension, mildly decreased in flexion and markedly decreased on rotation and lateral flexion. (Tr. at 241.) Further, when he saw Dr. Robbins, plaintiff's ROM was forward flexion 30 degrees, rotation 30 degrees, and lateral bend 10 degrees. (Tr. at 248.) Dr. Masci assessed plaintiff with 15% ppd, adding severe restrictions

---

[10]Plaintiff notes that the ability to engage in limited daily activities does not necessarily mean that the person is able to work. See Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). However, the ALJ relied on various factors, just one of which was daily activities. Plaintiff also points out his testimony that he had difficulty with certain tasks such as driving and carrying heavy grocery bags. However, the ALJ accepted that plaintiff had some difficulty lifting and carrying, and accordingly limited his RFC to light work with only occasional postural movements. See Orlando v. Heckler, 776 F.2d 209, 214 (7th Cir. 1985) (affirming where the claimant did not regularly take strong pain medication, had no regular treatment, and his "'description of his daily activities indicates that he engages in a wide variety of sedentary and light household and recreational activities in spite of his discomfort and he should be able to perform light work as well'") (quoting ALJ's decision). I cannot conclude that the light RFC adopted by the ALJ was inconsistent with plaintiff's limited daily activities.

[11]According to the source cited in plaintiff's brief, "normal" ROM is 40-60 degrees forward flexion, 30-45 degrees lateral flexion, extension 30 degrees and rotation 45-80 degrees. Dr. Hawkins noted plaintiff to have 10 degrees rotation to the left and right, 60 degrees flexion and 20 degrees extension. (Tr. at 245, 246.)

13

on lifting, full-time work, and head flexion and rotation. (Tr. at 239-40.) Dr. Robbins assessed 10% ppd. (Tr. at 250.) Plaintiff alleges that the ALJ ignored these findings. I disagree.

First, the ALJ was not required to give any specific weight to the percentage of permanent partial disability assigned by the doctors. Those percentages are set under state workers' compensation standards and have no relation to disability under social security regulations.[12]

Second, the ALJ adequately explained why she rejected the severe restrictions contained in Dr. Masci's report. The ALJ afforded the report little weight, given Dr. Masci's brief treatment of plaintiff (just two visits) and the report's inconsistency with the record as a whole.[13] Under SSA regulations and rulings, a treating source opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory

---

[12] I have in the past reversed where the ALJ ignored a medical report containing a substantial ppd assessment. Samuel v. Barnhart, 295 F. Supp. 2d 926, 956 (E.D. Wis. 2003). However, the error was in ignoring the report, not failing to account for the specific percentage assigned by the doctor. The ALJ did not ignore Dr. Masci's report in the present case, as I discuss later in the text. The ALJ also mentioned Dr. Robbins's report and the 10% ppd figure. (Tr. at 17.) Although she did not assign any specific weight to Robbins's report, the failure was at most harmless error because the report contained no specific restrictions.

[13] The Commissioner argues that Dr. Masci was not a treating physician but rather a consultant retained to provide support for plaintiff's workers' compensation claim. That does appear to be the case. (Tr. at 37.) Indeed, at the hearing, plaintiff's lawyer admitted that plaintiff saw Dr. Masci just twice for "an evaluative procedure." (Tr. at 39.) Social security regulations provide that a doctor does not qualify as a treating source if he saw the claimant solely to produce a report in support of the disability claim. 20 C.F.R. 404.1502. Nevertheless, the ALJ referred to Dr. Masci as plaintiff's "treating physician" (Tr. at 18) and provided reasons for giving his opinion little weight consistent with the factors in 20 C.F.R. § 404.1527(d). I cannot agree with plaintiff that the ALJ ignored Dr. Masci's report. She declined to adopt his opinion to the extent it supported total disability.

14

diagnostic techniques and "not inconsistent" with other substantial evidence. SSR 96-8p. If the report is not entitled to controlling weight, the ALJ must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d).

In the present case, the ALJ did not err in finding Dr. Masci's report inconsistent with the other medical evidence.[14] The pre-surgery records showed that plaintiff's condition responded well to conservative treatment, including medication and use of a cervical collar. (Tr. at 16; 167-69.) His condition further improved following his surgery. As the ALJ noted, by the time he was discharged by Dr. Hawkins, plaintiff was essentially symptom-free, aside from modest limitation in ROM. (Tr. at 17.) Dr. Hawkins specifically noted, on their final visit, that plaintiff was "neurologically doing well without neck pain" and had "no significant neck pain or problems." (Tr. at 245.)[15] The objective medical findings contained in Dr. Hawkins's post-surgery records, including normal shoulder shrug, muscle tone, strength and gait (Tr. at 245-47), in addition to the x-rays showing a stable fusion (Tr. at 251-52), strongly supported the ALJ's conclusion. Further, Dr. Hawkins was the physician with the longest treatment history with plaintiff and, as a neurosurgeon, he was in the best position to

---

[14] Plaintiff contends that the ALJ did not specifically state what part of the record was inconsistent with Dr. Masci's report, and that the Commissioner's citation of contrary medical evidence amounts to an improper post hoc repair job of the ALJ's decision. I disagree. The ALJ specifically discussed Dr. Hawkins's inconsistent findings. (Tr. at 17.)

[15] Likewise, the fact that plaintiff did not need any pain medication or other treatment undercut Dr. Masci's finding that plaintiff had severe pain and weakness. (Tr. at 17.)

15

evaluate plaintiff's condition. Dr. Hawkins provided no significant work restrictions when he released plaintiff from treatment. By contrast, as the ALJ noted, Dr. Masci saw plaintiff just twice,[16] and it appears that he was an occupational medicine physician, not a neurosurgeon. Finally, the ALJ relied on the opinions of the SSA consultants, who determined that plaintiff could perform a full range of light or medium work, with no postural limitations.[17] (Tr. at 18.) The ALJ properly declined to give such reports controlling weight, but she was permitted to consider the opinions of these highly qualified experts in the field. See Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996) (noting that the ALJ can adopt the opinion of a consulting physician, who may bring expertise and knowledge of similar cases, over that of a treating physician, who may want to do a favor for a friend and client and thus too quickly find disability).

Third, plaintiff fails to persuasively explain why any limited range of neck motion restricted him from a full range of light work. He cites a report from the International Labor Organization concerning the effects of posture on ability to work. However, the report offers nothing specific to plaintiff's case. Plaintiff cites no authority for the proposition that a less than "complete range of motion" precludes a full range of light work. (Pl.'s Reply Br. at 2.)

---

[16]"It would be exceedingly illogical to credit a doctor's opinion because he is more likely to have a detailed and longitudinal view of the claimant's impairments when in fact, there is no detail or longitudinal view." Scheck, 357 F.3d at 702 (emphasis in original).

[17]Plaintiff states that Dr. McDermott found that he could perform medium work and thus did not support the ALJ's conclusion that he was limited to light work. However, the ability to perform medium work encompasses the ability to perform light and sedentary work. 20 C.F.R. 404.1567(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work."). Further, the ALJ need not rely on one single medical report in setting RFC; rather, RFC should be based on the record as a whole. Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir 1995). The ALJ considered the entire record in the present case. (Tr. at 16.)

Dr. Hawkins found that plaintiff had no significant neck limitations, and the ALJ was permitted to credit this substantial evidence. See Luna, 22 F.3d at 692 (affirming use of Grid where there was substantial evidence supporting the finding that claimed non-exertional limitations had no significant impact on the claimant's ability to perform a full range of work).

Finally, plaintiff contends that the ALJ failed to consider the problems with his left wrist. Plaintiff told Dr. Masci that he had left wrist pain, and the medical records reflect two previous surgeries on the wrist. However, plaintiff cites no medical evidence of any restriction on his ability to work due to his wrist. Nor did he mention this condition in his application for benefits or in his testimony at the hearing. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [his] claim of disability." Scheck, 357 F.3d at 702.[18] Given plaintiff's failure to do so, the ALJ's failure to consider his wrist condition was, at the very most, harmless error. See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).[19]

---

[18]Plaintiff notes that he mentioned his wrist condition in a Reconsideration Disability Report. (Tr. at 105.) I cannot conclude that the ALJ committed reversible error based on this vague reference.

[19]In his main brief, plaintiff states: "As Plaintiff's then counsel suggested, perhaps Plaintiff was entitled to a closed period of disability, because he had been totally disabled for greater than 12 months." (Pl.'s Br. at 25.) However, he does not develop an argument that the ALJ erred in declining to consider a closed period; nor does he mention the issue at all in his reply brief. Therefore, I consider it waived. See Weinstein v. Schwartz, 422 F.3d 476, 477 n.1 (7th Cir. 2005) ("The failure to develop an argument constitutes a waiver.").

## V. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 1st day of November, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge